**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES E. LARGE; GARY COLLINS;
EMMA LUCILLE MCADAMS;
PATRICIA BERGIE; PETE
CALHOUN,

      Plaintiffs-Appellees,

v.

FREMONT COUNTY, WYOMING;
DOUG THOMPSON, JANE
ADAMSON, PAT HICKERSON, in
their official capacity as Fremont
County Commissioners; JULIE
FREESE, in her official capacity as
Fremont County Court Clerk,

      Defendants-Appellants.

No. 10-8071

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:05-CV-00270-ABJ)**

---

J. Scott Detamore of Mountain States Legal Foundation, Lakewood, Colorado, for
Defendants-Appellants.

Laughlin McDonald of American Civil Liberties Union Foundation, Inc., Atlanta,
Georgia (Andrew W. Baldwin, Berthenia Crocker, and Janet Millard of Baldwin,
Crocker & Rudd, P.C., Lander, Wyoming, with him on the brief), for Plaintiffs-
Appellees.

---

Before **KELLY, SEYMOUR,** and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

We are called upon in this appeal to decide what level of deference—if any—must be afforded to a local governmental entity's proffered plan to remedy an adjudged violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("Section 2"), when that proposed remedy unnecessarily conflicts with state law. We believe that when such plans in effectuating their remedial purposes do not adhere as closely as possible to the contours of the governing state law, they are not eligible for the deference customarily afforded legislative plans. Consequently, in this case, we affirm the district court's order that rejected the Fremont County Board of Commissioners' proposed remedial plan, and hold, under settled Supreme Court precedent that strongly favors single-member districts in court-ordered plans, that the district court did not abuse its discretion in fashioning a remedial plan solely consisting of single-member districts.

## I. BACKGROUND

On October 5, 2005, residents of Fremont County, Wyoming, who are members of the Eastern Shoshone and Northen Arapaho Tribes ("Appellees"), filed suit against Fremont County (the "County")[1] alleging that its at-large system

---

[1] In addition to the County itself, individual members of the Fremont County Board of Commissioners and the Fremont County Clerk were also sued in their official capacities. For purposes of this opinion, they are—except where

(continued...)

for electing commissioners to the Fremont County Board of Commissioners (the "Board") violated Section 2 by preventing the politically cohesive Native American vote from electing a candidate of their choice due to racially polarized white-bloc voting. Although Native Americans made up 20.94% of the countywide population in 2000,[2] with a vast majority of these Native Americans living on the Wind River Indian Reservation, they had largely been unsuccessful in attaining representation on the five-member board, either through the election of a Native American or a Native American-preferred candidate. *See Large*, 709 F. Supp. 2d at 1221. Notably, as of 2010, there had been eight Native American candidates for positions on the Board, with only one ever having been elected. *See id.* at 1221.

Following a nine-day bench trial, the district court entered judgment against the County, holding that the at-large election scheme diluted the Native American vote, and thus violated Section 2. *See id.* at 1231. The Board was

---

[1](...continued)
noted—referred to collectively as the "County."

[2] The county has a single-race Native American population of 7047, or 19.68% of the total population. Counting persons who identify as at least part Native American raises that number to 20.94%. Those percentages shrink, however, if one considers only "voting-age persons" ("VAP"): single-race Native Americans comprise only 16.03% of the VAP population, while including the "any part" Native American VAP population only increases the latter percentage to 17.01%. *See Large v. Fremont Cnty., Wyo.*, 709 F. Supp. 2d 1176, 1183 (D. Wyo. 2010).

subsequently ordered to present a remedial plan to cure the violation, which it did on June 25, 2010.

The Board's proposed plan—the subject of this appeal—consists of two districts: one single-seat majority Native American district, representing 19.2% of the county's population, and one four-seat majority white district encompassing the rest of the county and representing the remaining approximately 80.8% of the county population.[3] Under this plan, the commissioners would be elected for four-year staggered terms. Candidates from the majority Native American district would be required to reside in the district and could only be voted on by members of the district. Meanwhile, the four remaining seats allocated to the majority white district would be elected by the remaining populace using an at-large scheme, with two board members elected every other year.

Of some importance to this appeal is the fact that this "hybrid" election scheme is not authorized under Wyoming law. *See* Wyo. Stat. Ann. § 18-3-501 (2010). More specifically, Wyoming law envisions only one of two scenarios for county-commissioner elections: at-large voting for all the commissioner seats, or

---

[3]        In addition to this plan, the Board also submitted an alternative plan. For reasons that are not clear from the record, however, both the district court and the parties never gave significant consideration to the alternative plan, which, like the plan discussed above, had one single-member district and four at-large seats. On appeal, the County does not maintain that the district court erred in failing to consider this alternative plan; consequently, we do not consider that plan further.

the creation of five single-member districts where each commissioner "shall reside in and represent the district from which he is elected by the electors of that district." *Id.* § 18-3-501(h).[4]

After entertaining oral arguments regarding the sufficiency of this remedial plan, the district court rejected the Board's proposal in favor of a plan with five single-member districts, as initially proposed by the Appellees. The district court acknowledged that "redistricting is [primarily] a legislative task." Aplt. App. at 208 (Order on Remedial Plan, filed Aug. 10, 2010). Nevertheless, the court concluded that adopting the plan was inappropriate in light of the fact that the proposed plan violated Wyoming state law and also failed to cure the harm that it identified in the original voting scheme.

As the court explained, although "the Board is free to exercise its legislative judgment in proposing a plan to replace that stricken by the Court, . . .

_____

[4]      Following the district court's opinion in this case, the Wyoming legislature passed an amendment to § 18-3-501(h) which, effective July 1, 2011, specifically authorizes the type of election scheme proposed by the Board. *See* 2011 Wyo. Sess. Laws Ch. 78 ("[B]eginning January 1, 2012, . . . commissioners may serve at large or . . . district representation may be apportioned in any combination of single member, multi-member and at large representation, provided that in all cases commissioners represent a population as nearly equal as is practicable considering the geographic, economic and social characteristics of the county."). Although this change in the law empowers Wyoming counties—including Fremont County—to adopt hybrid election schemes in the future, for purposes of this appeal it has no effect. Indeed, the County expressly acknowledged as much. Aplt. Rule 28(j) Ltr. at 1 (dated Mar. 7, 2010) ("Fremont County does not contend that this amendment applies to or in any way controls this case."). The law at the time the district court rendered its decision was clear—no such hybrid system was allowable under § 18-3-501.

when doing so, and *insofar as possible*, the Board is not free to disregard state law." *Id.* at 212 (emphasis added).  Given that Wyoming law did not anticipate the creation of a hybrid-district scheme, the court found that the Board's plan "do[es] not withstand scrutiny as [it is] not consistent with principles governing state law." *Id.* at 216.  Moreover, the district court found that the Board, in crafting such an overwhelmingly Native American district (one that, in essence, simply surrounded the Wind River Indian Reservation), presented a plan that "preserve[d] the racial separation in the county" and "perpetuate[d] the separation, isolation, and racial polarization in the County, guaranteeing that the non-Indian majority continues to cancel out the voting strength of the minority." *Id.*  In addition, the district court found it troubling that the proposed hybrid system allowed members of the white majority to vote for four commissioners as opposed to only one, which is "different from that opportunity for voting afforded the Native American population." *Id.* at 218.  In sum, the court concluded that the Board's "proposed plan[] suffer[s] from the same deficiencies [found in the original, at-large election scheme] and tend[s] to perpetuate the isolation and polarization that have existed in the past in Fremont County." *Id.*

Following entry of the district court's order, this appeal ensued.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

Section 2 proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . imposed or applied by any State or political subdivision . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a).[5] Chief among the ills Section 2 seeks to address is voter dilution, which occurs when a political entity "enact[s] a particular voting scheme . . . [which] 'minimize[s] or cancel[s] out the voting potential of racial or ethnic minorities.'" *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quoting *Mobile v. Bolden*, 446 U.S. 55, 66 (1980)); *see* 42 U.S.C. § 1973(b) (stating that a Section 2 violation occurs "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a)"); *Thornburg v. Gingles*, 478 U.S. 30, 47–48 (1986) ("This Court has long recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial

---

[5] *See generally* Janai S. Nelson, *White Challengers, Black Majorities: Reconciling Competition in Majority-Minority Districts with the Promise of the Voting Rights Act*, 95 Geo. L.J. 1287, 1293–94 (2007) ("Although section 2 does not establish a right of minority communities to proportional representation, it nonetheless secures them a place in the electoral process that is meaningful and free from discrimination by banning discrimination through intent or effect and measuring violations of the statute by their impact on minority voters' electoral participation." (footnote omitted)).

minorities in the voting population." (alteration omitted) (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)) (internal quotation marks omitted)); *Simmons v. Galvin*, 575 F.3d 24, 28 n.2 (1st Cir. 2009) ("Vote dilution claims comprise the vast majority of § 2 claims."). Where, as here, a Section 2 violation has been found, based on a claim of voter dilution, the remedy is often some form of redistricting to rectify those factors that have resulted in the prohibited inequity. *See, e.g.*, *Sanchez v. Colorado*, 97 F.3d 1303, 1329 (10th Cir. 1996) (ordering, in a case involving a Section 2 violation, that Colorado "implement a remedial plan of redistricting consistent with . . . the dictates of § 2"); *see also* Stephen Ansolabehere, Nathaniel Persily & Charles Stewart III, *Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act*, 123 Harv. L. Rev. 1385, 1391 (2010) ("Section 2 litigation is almost exclusively concerned with vote dilution by way of at-large systems of representation or redistricting plans. When successful, it usually leads courts to create majority-minority districts that give minority voters a greater chance of electing their preferred candidates." (footnotes omitted)).

Although in such circumstances the catalyst for redistricting is a federal-court order, the Supreme Court has routinely cautioned that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (plurality) (White, J.); *see Connor v. Finch*, 431 U.S. 407, 414–15 (1977);

*Chapman v. Meier*, 420 U.S. 1, 27 (1975); *White v. Weiser*, 412 U.S. 783, 794–95 (1973).[6]  Consequently, "[w]hen a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."  *Wise*, 437 U.S. at 540; *see also United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) ("[A]t least in redistricting cases, district courts must offer governing bodies the first pass at devising a remedy.").  If a new legislative plan is forthcoming, then that remedial plan "will . . . be the governing law unless it, too, is challenged and found to violate the Constitution."  *Wise*, 437 U.S. at 540; *see also McGhee v. Granville Cnty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988) ("[A] reviewing court must . . . accord great deference to legislative judgments about the exact nature and scope of the proposed remedy . . . .").

On appeal, the County raises two challenges to the district court's order—specifically, that the district court erred in rejecting the Board's remedial

---

[6]     Recently, the Court strongly underscored this point in the context of a preclearance dispute under § 5 of the Voting Rights Act.  *See Perry v. Perez*, 132 S. Ct. 934, 940 (2012) (per curiam) ("Redistricting is 'primarily the duty and responsibility of the State.'" (quoting *Chapman*, 420 U.S. at 27)).  Notably, the Court observed: "[E]xperience has shown the difficulty of defining neutral legal principles in this area, for redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment." *Id.*

plan on the grounds that (1) it conflicted with state law, and (2) it did not remedy the Section 2 violation. As to the first, the County contends that the district court erred in not deferring to its plan because "State law empowerment, [either] procedural[] or substantive[], is not required for the legislative body to act to remedy a Section 2 violation." Aplt. Opening Br. at 20. "All that is required," the County maintains, "is that the legislative body remedy the violation, not create a new violation, and comply with equal protection principles." *Id.* Regarding the second, the County maintains that "the Board's Remedial Plan remedies the Section 2 violation . . . because the presence of a supermajority of American Indian voters in District 1 practically guarantees the ability of American Indian voters to elect a candidate of choice in proportion to the population of American Indians in Fremont County." *Id.* at 34. We find our resolution of the County's first argument to be dispositive; therefore, we need not—and do not—address its second.

As an issue of law, we review de novo the question of whether the Board's remedial scheme is a "legislative plan" owed deference by the district court. *See Gingles*, 478 U.S. at 79 (recognizing that in Section 2 disputes, the district court's legal determinations—including mixed questions of law and fact—are reviewed de novo). Our ultimate review of the appropriateness of the district court's chosen remedy, however, is only for abuse of discretion. *See Connor*, 431 U.S. at 415.

The threshold issue presented by this appeal is whether the Board's remedial scheme is a legislative plan, and thus owed substantial deference. *See Wise*, 437 U.S. at 540; *see also Tallahassee Branch of NAACP v. Leon Cnty., Fla.*, 827 F.2d 1436, 1438 (11th Cir. 1987) ("[F]ederal courts must defer to the judgment of a state legislative body in the area of reapportionment. Principles of federalism and common sense mandate deference to a plan which has been legislatively enacted."). If not, then the plan that the court put into place—even if affirmatively supported by Appellees—is deemed to be a court-ordered plan, and "[a] more stringent standard is applied . . . because a federal court, lacking the political authoritativeness that the legislature can bring to the task, must act circumspectly, and in a manner free from any taint of arbitrariness or discrimination." *Wise*, 437 U.S. at 541 (quoting *Connor*, 431 U.S. at 415) (internal quotation marks omitted); *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997) ("Court-ordered districts are held to higher standards of population equality than legislative ones."); *see also Tallahassee Branch of NAACP*, 827 F.2d at 1438 ("When a reapportionment plan is prepared by the district court, 'equitable considerations demand a close scrutiny and mandate the fashioning of a near-optimal apportionment plan.'" (quoting *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985))). In such circumstances, the Supreme Court has instructed that, "[a]mong other requirements, a court-drawn plan should prefer single-member districts over multimember districts, absent persuasive justification to the

contrary." *Wise*, 437 U.S. at 540; *see also Chapman*, 420 U.S. at 26–27 ("We hold today that unless there are persuasive justifications, a court-ordered reapportionment plan . . . must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minimis variation."). Thus, if the Board's remedial scheme is not a legislative plan, the district court's adoption here of a single-member district plan was, absent compelling circumstances militating toward a different outcome, almost assuredly a proper exercise of its discretion. The County makes no serious argument to the contrary. *Cf.* Aplt. Opening Br. at 12 (eliding the district court's exercise of discretion in adopting single-member districts, and noting that the only "standard of review is de novo," and that is "because this appeal involves only the district court's legal conclusions").

Instead, the County expends a considerable amount of energy arguing that the Board's remedial plan is, in fact, a legislative one. It avers that "the Board is the duly elected legislative body for the citizens of Fremont County and it exercised its political and policy judgment based on local conditions and dynamics in preparing its Remedial Plan," and that, "[t]herefore, the Board's Remedial Plan is a legislative plan, entitled to substantial deference, even though the Board did not have the legislative power to change the electoral system." *Id.* at 16.

In support of its position, the County relies on *Wise v. Lipscomb*, a case it considers "on all fours" with the current dispute. *Id.* at 13. As the County reads it, in *Wise,* "the Supreme Court determined that a city council's remedial plan was legislative and entitled to deference even if, due to conflicts with State law, the city council did not possess the legislative power to enact the plan." *Id.* However, *Wise* does not aid the County's cause.

*Wise* is a plurality opinion, and the Court diverged on the important point of whether the purported conflict with state law was relevant to whether the city council's remedial action should be deemed a legislative plan. The plaintiffs there pointed out the apparent conflict, "suggest[ing] that the city was without power to enact the ordinance [involving single-member districts] because the at-large system declared unconstitutional was established by the City Charter and because, under the Texas Constitution and Texas statutory law the Charter cannot be amended without a vote of the people." *See Wise*, 437 U.S. at 544 (citations omitted). Justice White announced the opinion of the Court and was joined by Justice Stewart. He agreed with the district court, which determined that, "[a]lthough the Council itself had no power to change the . . . system as long as the Charter provision remained intact, once the Charter provision was declared unconstitutional, and, in effect, null and void, the Council was free to exercise its legislative powers which it did by enacting the [new] plan." *Id.*

Justice White reasoned: "When the City Council reapportioned itself by means of a resolution and ordinance, it was not purporting to amend the City Charter but only to exercise its legislative powers as Dallas'[s] governing body." *Id.* Important to Justice White's conclusion was the fact that "[t]he record suggest[ed] no *statutory*, state constitutional, or judicial prohibition upon the authority of the City Council to enact a municipal election plan under [these] circumstances." *Id.* at 544 n.8 (emphasis added). "In short, Justice White found that the commission did not *lack* authority, but rather *had* authority to reapportion itself." *Tallahassee Branch of NAACP*, 827 F.2d at 1442 (Godbold, J., dissenting).

In contrast, Justice Powell, who concurred in the judgment, along with Chief Justice Burger, Justice Blackmun, and Justice Rehnquist, asserted that "[t]he essential point is that the Dallas City Council exercised a legislative judgment, *reflecting the policy choices of the elected representatives of the people*, rather than the remedial directive of a federal court." *Wise*, 437 U.S. at 548 (Powell, J., concurring in part and concurring in the judgment) (emphasis added). "Th[e] rule of deference to local legislative judgments remains in force," Justice Powell concluded, "even if . . . our examination of state law suggests that the local body lacks authority to reapportion itself." *Id.*

The County contends that Justice Powell's opinion is controlling, citing the Supreme Court's opinion in *Marks v. United States*, 430 U.S. 188 (1977). In

- 14 -

*Marks*, the Supreme Court held: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). "In practice, however, the *Marks* rule produces a determinative holding 'only when one opinion is a logical subset of other, broader opinions.'" *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Thus, for example, one inquiry under *Marks* might be whether "the concurrence posits a narrow test to which the plurality must *necessarily* agree as a logical consequence of its own, broader position." *King*, 950 F.2d at 782 (emphasis added); *accord Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1359 (10th Cir. 1992). "When, however, one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic." *King*, 950 F.2d at 782; *see Homeward Bound*, 963 F.2d at 1359; *see also Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1057 (3d Cir. 1994) ("[I]t is not always possible to discover a single standard that legitimately constitutes the narrowest ground for the decision."). "We do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive." *Carrizales-Toledo*, 454 F.3d at 1151; *see United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) ("When

- 15 -

it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court."); *Rappa*, 18 F.3d at 1058 (discussing unsuccessful application of the *Marks* rule and that "[i]n such cases, no particular standard constitutes the law of the land, because no single approach can be said to have the support of a majority of the Court").

As explicated above, the *Marks* rule does not avail the County. Indeed, the rule actually cuts against the County by suggesting that Justice White's decision is controlling. Justice Powell would oblige federal courts to give deference to the policy choices of local governments in redistricting, irrespective of whether those choices are authorized by state law. Justice White, on the other hand, would condition federal-court deference on a determination that local governments were exercising their policy-making, redistricting powers within the authorized boundaries of state law. It is patent that Justice Powell's view is not a "logical subset," *King*, 950 F.2d at 781, of Justice White's: Those adopting the view of Justice White's opinion—which conditions federal-court deference on state-law authorization—would not "necessarily agree as a logical consequence," *id.* at 782, of their view with Justice Powell's position—under which state-law authorization is irrelevant. Indeed, Justice White's plurality opinion appears to actually establish the narrower holding which, as a logical matter, is a subset of Justice

- 16 -

Powell's position.  Specifically, Justice White's opinion could be read as carving out a subset of local-government redistricting decisions that are entitled to federal-court deference—that is, those authorized by state law.  *See Homeward Bound*, 963 F.2d at 1359 (applying *Marks*'s rule and "read[ing] the plurality opinion as setting forth a narrower standard" because it imposed an additional substantive showing that must be satisfied to justify relief).  Those embracing Justice Powell's position—according federal deference to *all* local-government redistricting decisions—seemingly would be logically compelled to agree, at a minimum, that this subset of local-government redistricting decisions, which are authorized by state law, should be given federal-court deference.  *See King*, 950 F.2d at 781 ("In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment.").  Therefore, viewed through the lens of *Marks*, not only does the Court's decision in *Wise* not help the County, it actually appears to undermine its position.  One thing is clear under *Marks*: Justice Powell's concurrence does not establish the controlling law of the land.[7]  Whether that controlling status should be accorded to Justice White's plurality opinion is a question that we need not decide here.  Suffice it to

---

[7]    We recognize that the Eleventh Circuit has accorded controlling effect to Justice Powell's concurrence regarding the issue before us.  *See Tallahassee Branch of NAACP*, 827 F.2d at 1439–40.  However, that court did not rely upon *Marks* in reaching its conclusion and, therefore, we do not find its reading of the import of *Wise*'s multiple opinions to be persuasive.

say, we find Justice White's opinion persuasive, especially given our view—explicated below—that, in the context of presiding over the implementation of Section 2 remedial plans, federal courts owe their deference first and foremost to legislators of sovereign States, and only through them to local governmental entities.

We acknowledge that the County does not rely on the *Marks* rule, alone, in advocating for the substance of Justice Powell's position. Specifically, the County cites the Court's later opinion in *McDaniel v. Sanchez*, 452 U.S. 130 (1981), and contends that Justice Powell's position was "endorsed" by *Sanchez*. Aplt. Opening Br. at 15. Although the Court in *Sanchez* deemed Justice Powell's view instructive on the question of whether state-law authority was necessary for a local-government redistricting plan to be deemed a legislative plan, and concluded that Justice Powell's negative answer to that question "foreshadowed [its] holding," *Sanchez*, 452 U.S. at 146, the Court repeatedly stressed that "it [was] concerned only with the question whether the reapportionment plan submitted to the District Court should be considered a legislative plan *for purposes of preclearance under § 5* [of the Voting Rights Act]," *id.* at 139 (emphasis added). *See generally* 42 U.S.C. § 1973c(a) (setting forth the requirements of § 5); *Riley v. Kennedy*, 553 U.S. 406, 412 (2008) ("Section 5 requires covered jurisdictions to obtain what has come to be known as 'preclearance' from the District Court for the District of Columbia or the DOJ

before 'enact[ing] or seek[ing] to administer' any alteration of their practices or procedures affecting voting." (alterations in original) (quoting 42 U.S.C. § 1973c(a))); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 n.14 (5th Cir. 2011) (discussing § 5's preclearance process).

That the holding of *Sanchez* is firmly rooted in the distinct context of preclearance under § 5 is readily apparent from the Court's description of the issue before it:

> We granted certiorari to decide whether the preclearance requirement of § 5 of the Voting Rights Act of 1965, as amended, applies to a reapportionment plan submitted to a Federal District Court by the legislative body of a covered jurisdiction in response to a judicial determination that the existing apportionment of its electoral districts is unconstitutional. . . . [T]he District Court held that the plan submitted to it in this case was a judicial plan and thus excepted from the requirements of § 5. . . . [T]he Court of Appeals for the Fifth Circuit reversed; it held that because the plan had been prepared by a legislative body, it was a legislative plan within the coverage of § 5. We are persuaded that Congress intended to require compliance with the statutory preclearance procedures under the circumstances of this case.

*Sanchez*, 452 U.S. at 131–33 (footnotes omitted). Thus, the focus of the *Sanchez* Court was on determining what should be deemed a legislative plan in the discrete setting of § 5 preclearance, with its unique policy concerns. As the Court noted, in the preclearance setting "it is not sufficient to demonstrate that the new plan is constitutional; the covered jurisdiction also has the burden of demonstrating that the districting changes are not motivated by a discriminatory purpose and will not

have an adverse impact on minority voters." *Id.* at 137. Indicative of the Court's significant efforts to determine the right answer for the unique context of § 5 to this legislative-plan inquiry, the Court turned to legislative history when it found "sufficient ambiguity in the statutory language." *Id.* at 147. The Court observed that "[t]he prophylactic purposes of the § 5 remedy are achieved by automatically requiring 'review of *all* voting changes prior to implementation by the covered jurisdictions.'" *Id.* at 151 (quoting S. Rep. No. 94-295, at 15 (1975)). And the Court suggested that evident in the legislative history was Congress's view that permitting covered jurisdictions to avoid preclearance requirements by submitting their plans to courts and thereafter claiming that the plans are excepted from preclearance requirements because the submission has transformed them into judicial plans would not aid and possibly would impede the successful implementation of § 5's purposes. *See id.* at 151. It was in this unique context that *Sanchez* endorsed Justice Powell's view from *Wise* and held that "[t]he *application of the statute* [i.e., § 5] also is not dependent upon any showing that the [local government apportioning entity] had authority under state law to enact the apportionment plan at issue in this case." *Id.* at 152 (emphasis added).

Consequently, we agree with Judge Godbold (writing in dissent) who concluded that *Sanchez* does not "imply that the Court adopted Justice Powell's *Wise* opinion" for application *outside of* the § 5 setting. *Tallahassee Branch of NAACP*, 827 F.2d at 1446 (Godbold, J., dissenting). More specifically, as Judge

- 20 -

Godbold noted, "*Sanchez* did not address the issue we must decide, which is whether the same definition of legislative plan should apply in both a § 2 and a § 5 preclearance case." *Id.* at 1447. He answered in the negative and, in particular, reasoned as follows:

> The issue involved in a § 5 proceeding is different from that before us. Under § 5 the legislative body must demonstrate that the proposed plan is constitutional, that it was not motivated by a discriminatory purpose, and that it will not have an adverse impact on minority voters. A § 5 inquiry asks whether a legislature *can* enact a proposed plan; if the plan gets § 5 preclearance it *may* become effective. Section 5 does not address in any fashion questions of whether the legislative body acted legally under state law in fashioning a plan.
>
> While a legislatively enacted reapportionment plan is the preferred remedy after a judicial finding of unconstitutional apportionment, I believe that the Supreme Court cases articulating this preference do not contemplate that a legislature can satisfy this responsibility—and therefore avoid the more stringent requirements applicable to court-ordered plans—by submitting a plan that not only has not been enacted pursuant to valid state procedures governing reapportionment but also has in fact been fashioned in derogation of those procedures.

*Id.* Therefore, like Judge Godbold, we conclude that the County's reliance on *Sanchez* as an endorsement of Justice Powell's position in *Wise* is unavailing.

The County contends, and it must be admitted, that "Section 2 contemplates that State law will be displaced," Aplt. Opening Br. at 29 (capitalization altered), and that "Wyoming law provides no permissible options to remedy the Section 2 violation identified by the district court" without some portion of state law being

- 21 -

violated, *id.* at 24.  For example, there is no dispute that ordinarily under Wyoming law adoption of a plan of single-member districts for a five-member Board would necessitate a petition and a vote of the people.  Wyo. Stat. Ann. § 18-3-501(g); *see also* Aplt. Opening Br. at 31 ("The electoral system in five-member Boards is at large and the Board is not empowered to elect any other system of districting unless a referendum election, initiated through the petition procedure set out above, is held and passed by the electorate.").  However, the mere fact that some state laws may *necessarily* need to be displaced to permit the effectuation of a federal civil-rights remedy under Section 2 does not mean that local governmental bodies like the County may unnecessarily—as a matter of preference—disregard the dictates of state law in fashioning their plans and still claim the judicial deference for their handiwork that is traditionally accorded to legislative plans.[8]  *Cf. McGhee*, 860 F.2d at 118 ("If a vote dilution violation is

---

[8]     The County looks to two district court decisions for support: *United States v. Village of Port Chester*, 704 F. Supp. 2d 411 (S.D.N.Y. 2010), and *United States v. Euclid City School Board*, 632 F. Supp. 2d 740 (N.D. Ohio 2009).  In both cases, a legislative plan was challenged on the basis that it conflicted with state law because it employed cumulative voting, a procedure not *explicitly endorsed* by the laws of the States at issue.  The court in *Village of Port Chester* did not find this problematic because cumulative voting was not *expressly prohibited* by state law either, and also was not in tension with any other state election laws.  *See* 704 F. Supp. 2d at 449.  Such reasoning, however, actually may be read as working against the County's position because the court did not reject the plaintiffs' challenge on the basis that compliance with state law is irrelevant—which seemingly would have been the natural response of a judicial adherent of Justice Powell's position in *Wise*.  *See Wise*, 437 U.S. at 548 (Powell, J., concurring in part and concurring in the judgment) (noting that "[t]he essential
(continued...)

established, the appropriate remedy is to restructure the districting system to eradicate, to the maximum extent possible by that means, the dilution proximately caused by that system; it is not to eradicate the dilution by altering other electoral laws, practices, and structures that were not actually challenged by the claim as made." (emphasis omitted) (internal quotation marks omitted)).

In remedial situations under Section 2 where state laws are *necessarily* abrogated, the Supremacy Clause appropriately works to suspend those laws because they are an *unavoidable obstacle* to the vindication of the federal right. *See Barber ex rel. Barber v. Colo. Dept. of Revenue*, 562 F.3d 1222, 1232 (10th Cir. 2009) ("A state statute must yield when it conflicts with a federal statute, as in the case where the challenged state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (alterations omitted) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S.

[8](...continued)
point is that the Dallas City Council exercised a legislative judgment"). In *Euclid City School Board*, although the district court spoke in emphatic tones about the need to give deference to the apportionment judgment of political governmental entities, because of deficiencies in the government's presentation, the court was not compelled to squarely address the issue presented here. *See* 632 F. Supp. 2d at 750 n.9 (noting that the government "offered without citation or explanation" the assertion that the deference that is "*usually* appropriate" when courts review remedial apportionment plans was not appropriate in that case because of a conflict with state law). The court's analysis in *Euclid City School Board* is skeletal at best, and, ultimately, it is unpersuasive. In any event, unlike the state-law silence in both cases, Wyoming law clearly contemplated that there would be one of only two potential election schemes for county commissioners; neither scheme is reflected in the remedial plans submitted by the Board.

363, 373 (2000)) (internal quotations marks omitted)); *NCNB Tex. Nat'l Bank v. Cowden*, 895 F.2d 1488, 1494 (5th Cir. 1990) ("[T]he [S]upremacy [C]lause empowers Congress 'to pre-empt state laws to the extent it is believed that such action is *necessary* to achieve its purposes." (emphasis added) (quoting *City of New York v. FCC*, 486 U.S. 57, 63 (1988))).

The same cannot be said where in the course of remedying an adjudged Section 2 violation a local governmental entity gratuitously disregards state laws—laws that need *not* be disturbed to cure the Section 2 violation. *See Cleveland Cnty. Ass'n for Gov't by the People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998) (per curiam) ("[I]f a violation of federal law *necessitates* a remedy barred by state law, the state law must give way; if no such violation exists, principles of federalism dictate that state law governs." (emphasis added));[9] *cf. Bodker v. Taylor*, No. Civ.A.1:02-CV-999ODE,

---

[9] Although not directly on point, we believe that *Cleveland County* is instructive to our decision. In *Cleveland County*, residents challenged a settlement plan adopted by the local board of commissioners in response to a lawsuit by the NAACP alleging voting dilution. The plan, which increased the size of the board of commissioners from five to seven members and provided that voters would be permitted to cast only four votes for the seven positions, was later incorporated into a consent decree issued by the district court. *Cleveland Cnty.*, 142 F.3d at 469.

The challengers in that case asserted, *inter alia*, that the plan's adoption was contrary to state law, which had explicit provisions governing alterations of the structure of county boards and the method of election of candidates. The district court granted summary judgment for the county, but the D.C. Circuit

(continued...)

- 24 -

2002 WL 32587312, at *5 (N.D. Ga. June 5, 2002) ("For the court to defer to a

redistricting plan proposed by the Fulton County Board of Commissioners, one

that has not been considered by the General Assembly, would give to Fulton

County that which the state of Georgia intended to retain, and in so doing would

---

[9](...continued)
reversed. The appellate court concluded that, "[r]ead on its face, state law denies the Board the authority unilaterally to alter its structure and manner of election simply by agreeing to do so." *Id.* at 476.

In rendering its decision, the D.C. Circuit emphasized that no Section 2 violation had been found. *Id.* at 477. Had "the election plan set forth in the consent decree . . . intended to remedy an admitted or adjudged violation of the Voting Rights Act," the court explained, "the fact that the Board's actions collided with the state statutory scheme just discussed would not stand in the way of the plan's implementation." *Id.* However, it cautioned that even in those situations, the board's discretion would not be limitless—state law could be superseded only "if such supersession is *necessary* to remedy a violation of federal law," because "principles of federalism dictate that state law governs" unless "federal law *necessitates* a remedy barred by state law." *Id.* (emphases added). *See also Harper v. City of Chicago Heights*, 223 F.3d 593, 601 (7th Cir. 2000) ("The district court's plan suffers from the same procedural flaw as did the consent decree when it was first presented to this court: the court's plan modifies the election methods set forth in the Illinois Municipal Code without either going through the statutorily required procedures for making such changes to electoral methods *or making a judicial finding that it was necessary to make these changes in order to comply with federal law*." (emphasis added)); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 217 (7th Cir. 1995) ("Any modifications which must be accomplished through a referendum cannot be made by the consent decree unless the court finds that the statutory provisions would violate federal law *and that such changes are necessary to ensure compliance with federal law*." (emphasis added) (footnote omitted)). *Cleveland County* and the other cited authorities evidence a judicial sensitivity—grounded at least principally in federalism policy—to gratuitously abrogating state law in effectuating remedial voting plans. This sensitivity should not be lessened simply because the request to effect such an abrogation is made by a subordinate political subdivision of the State.

- 25 -

raise serious federalism concerns.").  In that situation, the conflict with state law is not a necessary consequence of the remedial operation of federal law but, rather, it reflects a mere policy disagreement between the political subdivision and the State that gave it life.

Our deference must run first and foremost to the legislative decision-making of the sovereign State and, only through it, to its subordinate political subdivision.  After all, it is the State that imbues the political subdivision with the apportionment power, and the subdivision cannot stand on an independent and equal footing with respect to its creator.  *Cf. Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978) ("This Court has often recognized that political subdivisions such as cities and counties are created by the State 'as convenient agencies for exercising such of the governmental powers *of the state* as may be entrusted to them.'" (emphasis added) (quoting *Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907))); *Reynolds v. Sims*, 377 U.S. 533, 575 (1964) ("Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities.  Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of *state* governmental functions." (emphasis added)).

When a political subdivision of a State substantively contravenes the laws of that State—at least insofar as that contravention is not sanctioned by higher federal law—it no longer acts as an agent of that sovereign, and therefore is due no federal-court deference. A natural corollary of this is that any remedial plan proposed by a political subdivision of a State cannot be deemed a legislative plan—i.e., a plan that is a valid expression of legislative process and policy judgment—unless it is bounded by state laws to the maximum extent possible.

In resisting this conclusion, the County holds on to the Supreme Court's warning that "[d]istricting inevitably has sharp political impact and . . . political decisions must be made *by those charged with the task*." *Weiser*, 412 U.S. at 795–96 (emphasis added). The County's Board says that it is so charged. *See* Aplt. Opening Br. at 28. But this is only partly true. In *Weiser*, "those charged with the task" were the Texas state legislators. *See Weiser*, 412 U.S. at 796 ("Here th[e redistricting] decisions were made by the [state] legislature in pursuit of what were deemed important state interests."). This makes the matter simpler—any potential conflict with state statutory laws that results from the state legislators' actions could be discounted based on the fact that those state legislators were entitled, as a collective, to change those laws absent some constitutional prohibition.[10]

---

[10]     *Cf. Richardson*, 384 U.S. at 85 (noting that a "*[s]tate's* freedom of
(continued...)

- 27 -

Not so in this case. The County's Board, while a legislative body, is a subordinate legislative entity; it is not inherently empowered to ignore or alter statutory requirements (and thus the policy judgments) of the superior legislative body of the State—that is, the Wyoming legislature. *Cf. United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of Camden*, 465 U.S. 208, 215 (1984) ("[A] municipality is merely a political subdivision of the State from which its authority derives."); *Hunter*, 207 U.S. at 178 ("The number, nature, and duration of the powers conferred upon [subordinate legislative entities] . . . rests in the absolute discretion of the state."); *Ralls Cnty. Court v. United States*, 105 U.S. 733, 737 (1881) ("[O]rganizations for local government, by whatever name they may be called, have only such powers as the legislatures of their respective States see fit to delegate to them."); *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1268 (10th Cir. 2004) (noting that state law may "den[y] a . . . municipality the power to regulate a given subject"); *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 (10th Cir. 2002) ("[C]ounties . . . are simply political subdivisions of the state government that possess only those functions that are

---

[10](...continued)
choice to devise substitutes for an apportionment plan found unconstitutional . . . *should not be restricted beyond the clear commands of the Equal Protection Clause* (emphasis added)); *City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010) ("[T]he Supreme Court has consistently favored the political judgments of *state legislatures* in structuring political subdivisions within states and defining the electoral community making up those entities." (emphasis added)).

- 28 -

granted to them by the constitution or by statute, along with implied powers necessary to carry those functions out."). Were we to ignore the import of state law in determining whether to give deference to a legislative plan proposed by a state subdivision, we would be granting deference to the wrong authority. We would, in essence, be using the authority of the federal courts to elevate a subordinate over its superior.

Put into context, if Wyoming law does not allow for a hybrid voting scheme, then it is *only* the dictate of this federal court that would give the County the authority to implement its plan. Where the Supremacy Clause's effect is to temporarily suspend the application of a conflicting state law, the creation of a remedial plan by a State's political subdivision that *in all other ways* comports with the requirements of state law is a valid exercise of "legislative judgment, reflecting the policy choices of the elected representatives of the people." *Wise*, 437 U.S. at 548 (Powell, J., concurring in part and concurring in the judgment). However, where that political subdivision's remedial plan contravenes state laws that have not been remedially abrogated by the Supremacy Clause, the plan could not be considered a valid exercise in legislative judgment because it would not respect the "policy choices" of the dominant sovereign from which the local governmental entity's authority flows. Instead, such a plan merely would enshrine parochial interests—not shared by the "elected representatives of the people" of that State—and its *only* claim to legitimacy would be that which a

federal court would be granting it by labeling it a legislative plan. However, we are hard-pressed to see how such a plan could be deemed such.

The misguided and problematic nature of the County's position becomes clear when we extrapolate and consider some of its implications. At oral argument, the County candidly suggested that, under its view, not only would it be entitled to ignore the state law restricting county elections to either at-large or single-member district voting, but it also would be free to ignore *any other state election law*, so long as the resulting plan does not either violate the Constitution or Section 2. Thus, in addition to adopting the hybrid election scheme, the County expressly noted in oral argument that, "in theory," it could have incorporated into its remedial plan a provision that the Board size be increased to fifty members, Oral Arg. at 09:58–10:00, and the Wyoming legislature—that has statutorily prescribed a commissioner limit of one-tenth of that number—would have been powerless to stop it. This is surely not what Congress intended the Voting Rights Act to be—carte blanche for local governments seeking to flout otherwise valid state laws.

Therefore, we hold that where a local governmental body's proposed remedial plan for an adjudged Section 2 violation *unnecessarily* conflicts with state law, it is not a legislative plan entitled to deference by the federal courts. As this was the case here, we also conclude that the district court did not err in

refusing to defer to the Board's plan. We further conclude that the district court did not abuse its discretion in implementing its single-member-district plan. Indeed, as previously noted, the County makes no serious argument to the contrary.

In the absence of a valid legislative plan, any redistricting plan adopted by the court would properly be deemed a court-ordered plan. As the district court properly noted, the Supreme Court has mandated the use of single-member districts in court-ordered plans—as opposed to legislative plans—when "there is no compelling reason for doing otherwise." Aplt. App. at 222; *see Chapman*, 420 U.S. at 16 (describing some of the "practical weaknesses inherent" in multimember districting plans). The County does not contend that a "compelling reason" exists to deviate from this preferred arrangement (i.e., single-member districts), nor does our independent review of the record suggest that there is one. Accordingly, we conclude that the district court properly followed the Supreme Court's guidance regarding single-member districts and it did not abuse its discretion when crafting its own remedial plan.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order that rejected the County's proffered Section 2 remedial plan and implemented a plan

of its own design.[11]  Our ruling here today does not foreclose the possibility that the County may ultimately implement its desired plan through the normal processes established by Wyoming law.  We do not opine on whether such a plan would satisfy the strictures of the Constitution or Section 2.  We simply hold here that federal courts owe no deference to Section 2 remedial plans offered by political subdivisions of a State, when those plans *unnecessarily* conflict with state law, and that the district court here exercised sound and permissible discretion in adopting its chosen plan.

---

[11]The County's renewed motion to expedite proceedings is denied as moot.

**No. 10-8071, Large v. Fremont County**

**KELLY**, Circuit Judge, concurring in result.

Though the matter is not free from doubt, Justice White's plurality opinion in Wise v. Lipscomb, 437 U.S. 535 (1978), is controlling here. Given the lack of a majority opinion in that case, we are guided by the position taken by the Justices who concurred in the judgment on the narrowest grounds. Marks v. United States, 430 U.S. 188, 193 (1977). Justice White's opinion is the narrowest ground for the judgment in Wise—while Justice Powell looked only to the exercise of legislative power to determine what constitutes a "legislative plan," Justice White also required that the exercise of legislative power not conflict with any state or local law. Applying that latter principle, the Board's plan would not be considered a legislative plan entitled to deference.

McDaniel v. Sanchez, 452 U.S. 130 (1981), is problematic because it did not require any legislative compliance with state law when enacting an apportionment plan, relying in part on Justice Powell's broader concurrence in Wise. Id. at 152. To be sure, McDaniel was a § 5 case, but it does seem peculiar that the Court would create one definition of "legislative plan" for § 5 compliance, and another for § 2 compliance. Tallahassee Branch of NAACP v. Leon Cnty. Fla., 827 F.2d 1436, 1440 (11th Cir. 1987). That said, McDaniel did not address this problem, and Wise remains the case most on point in the § 2 context.